GILLETTE SAFETY RAZOR CO. v.
STANDARD SAFETY RAZOR
CORPORATION.
No. 2321.

District Court, D. Connecticut.
Sept. 28, 1934.

Merrell E. Clark and Henry R. Ashton, both of New York City, and Henry F. Parmelee, of New Haven, Conn., for plaintiff.

George E. Middleton and George E. Faithfull, both of New York City, for defendant.

THOMAS, District Judge.

This is an infringement suit involving the Thompson patent, No. 1,924,262, for improvements in a safety razor blade, issued August 29, 1933, to the plaintiff as assignee on an application filed August 18, 1932, which was a division of the original application filed April 25, 1929, Serial No. 358,114. The bill charges defendant with infringement as to certain safety razor blades made and sold by

the defendant, and seeks the usual injunction, accounting, and damages.

Infringement is charged of claims 1, 3, and 4, of which 1 and 4 are typical, and they read:

"1. As a new article of manufacture, an elastic, transversely-flexible safety razor blade adapted for use in existing Gillette-type safety razors, said blade having unsharpened ends, being of uniform thickness, requiring external support on both sides for its cutting edge and being internally apertured to provide edges arranged to engage positioning and clamping means and hold the blade against angular displacement, and being also provided with reentrant recesses including a rounded portion at the inner angles thereof, located at the corner portions of the blade respectively and each extending both longitudinally and transversely of the blade to such an extent as to span the adjacent corner of the blade-clamping cap when assembled therewith, and to provide a clearance space of sufficient area to receive a cap corner if bent, whereby said blade while being flexed or when clamped cannot be subjected to pressure by a bent cap corner and danger of breaking said blade or distorting its cutting edge is eliminated."

"4. As a new article of manufacture, an elastic transversely-flexible razor blade adapted for use in existing Gillette type safety razors, said blade being internally apertured to provide edges arranged to engage positioning means and hold the blade against angular displacement, and being of substantially uniform thickness and so thin as to require external support on both sides thereof for substantially its full length to give rigidity to its cutting edge, and being also provided with reentrant recesses located at its corner portions respectively and each extending both longitudinally and transversely of the blade to such an extent as to span the adjacent corners of the blade-clamping cap when assembled therewith and provide a clearance space of sufficient area to receive a cap corner if bent, whereby said blade while being flexed or when clamped is relieved of the possibility of pressure from a bent cap corner."

The invention described and claimed in the patent in suit relates to safety razor blades for use in "Gillette-type" safety razors. In this type of razor a thin, flexible, and elastic blade of oblong contour with unsharpened ends, and internally apertured to receive positioning and clamping means, is removably secured in a holder which is made up of three parts, namely, a guard member, a cap, and a handle. The guard member is adapted to support the blade adjacent to its longitudinal cutting edges. The cap is provided on opposite sides with parallel straight edges which engage the blade adjacent to the cutting edges of the latter and flex it transversely on the guard member, as a fulcrum, during the process of clamping the blade, by means of the handle, between the guard member and cap, so that, when the parts are assembled, the blade is maintained in a transversely curved position and is externally supported adjacent its cutting edges to give it rigidity. A razor of this type is described in the original Gillette patent, No. 775,134, dated November 15, 1904 (Defendant's Exhibit 4). Its commercial form, as manufactured by plaintiff, is in evidence as Plaintiff's Exhibit 5. This razor was the original Gillette and is referred to in the record as the "original type" Gillette razor.

The facts stated in the specification of the patent in suit with reference to the "original type" Gillette razor are established by the evidence. On page 1, line 27 et seq. of the specification, the patentee says:

"In the use of such a razor, satisfactory operation requires very accurate positioning of the blade edge with respect to the guard, and consequently it is extremely desirable that the parts which engage and flex the blade should retain, permanently, the precise shapes and dimensions imparted to them when manufactured. This is particularly true of the longitudinal straight edges of the blade-clamping cap, on which the alignment and amount of exposure of the blade edges depend, but inasmuch as these cap edges are necessarily made thin, in order to enable the cutting edge of the blade to reach the skin when the razor is held at the proper shaving angle, they are very easily deformed, particularly at the cap corners, to such an extent as seriously to impair the efficiency of the razor.

"For example, the mere dropping of the razor, or of the cap alone, has frequently resulted in bending over a corner of the cap to an extent sufficient, when the clamping pressure is applied to the blade, to produce an uneven edge exposure or even to crack or break off a portion of the blade itself. Such a result may occur even when the bending of the cap corner is so slight that it is not likely to be noticed by the user, this being due to the fact that the pressure thereby applied to the blade tends to flex it locally in a different direction from that in which it has already been flexed by the cap as a whole, and according to a familiar geometrical principle the

blade can not be so flexed, even slightly, without subjecting it to a greatly increased stress. In such a case the user invariably considers the unsatisfactory operation of his razor to be due to a defective blade, and either continues to use the defective holder and to find fault with the blades, or else discards the razor in favor of one of another make."

After a number of unsuccessful attempts to cure the inherent defects of the "original type" and its improved type were made, as will hereinafter appear, Thompson solved the problem as stated in the patent in suit. At page 1, lines 66 to 83, inclusive, he says: "To meet the difficulty above explained I have devised an improvement which is applicable to any razor of the construction hereinbefore described and may be embodied therein without making any change except in the outline of the blade itself, my improved blade being given such a contour that even if the blade-clamping cap is bent at one or more of its corners, the positioning of the blade edge under the flexing action of the holder will not be affected thereby, nor will the blade be broken or cracked. In consequence, it becomes possible not only to obtain efficient service from razors using such blades, even if the cap corners become bent, but also to restore to satisfactory use a very large number of such razors which have been discarded or are now giving unsatisfactory service."

The damaged cap corner problem was of long standing and the resulting defective operation of the razor impaired plaintiff's business and good will. The "original type" Gillette razor (Plaintiff's Exhibit 5) and blade (Plaintiff's Exhibit 33) were put on the market by plaintiff some time after 1900. In the "original type" Gillette razor the longitudinal edges of the cap were made thin to enable the cutting edges of the blade to perform their proper function. The corners of the cap were rectangular and sharp. These razors were practically precision instruments wherein the blade was accurately supported on both faces adjacent the cutting edges thereof throughout the length of the cap and guard, and the cutting edges were exposed the proper amount for good shaving. These razors were supposed to be lifetime instruments, and the one thing which prevented them from giving satisfactory service for a lifetime was the damage to the cap corners. These corners were damaged, as the user would drop the cap or the entire razor on the bathroom floor or in the wash bowl, which would cause small burrs to form on the under surface of the cap corners where they would engage the blade near its corners when the blade was placed into the razor. These burrs would cause the blade edges to be unevenly exposed, with the result that the razor would exert a pull on the beard where the exposure was insufficient or would cut the user where the exposure was excessive.

For a number of years plaintiff received complaints about its blades. Some of the users, not knowing the source of the trouble, usually blamed the blades. In fact, the common rumor was that the Gillette blades were not as good as they used to be, although actually their quality had improved as plaintiff's manufacturing experience increased. The seriousness of the problem to the Gillette Company increased in proportion as the number of razors in use increased.

To meet the situation, plaintiff established a complaint department to which all users' complaints were referred. When a complaint was received the user was requested to send his razor to the company for examination. If upon examination it was found that the corners of the cap were damaged, a new razor was sent to the customer. The increasing number of complaints became almost "intolerable" by 1918, as appears from Fahey's testimony. In that year Fahey, who was in active charge of the management of plaintiff's business, inaugurated a service campaign which lasted from April to October, 1918. Another, begun in the fall of 1919, extended into 1920, and a third campaign was conducted in 1925. During these campaigns a group of experts was sent from city to city to hear the complaints of users of Gillette razors and to replace those which had been damaged in the hands of the users. Advertisements, requesting users who were having trouble with their Gillette razors to bring them to a certain designated store, were inserted in local newspapers in advance of the visits by plaintiff's representatives. As a result of these campaigns, thousands of razors were returned and replaced by the plaintiff. From the testimony it is clear that these campaigns disclosed that no less than 95 per cent. of the complaints handled by the experts were due to damaged razors.

In the early part of 1921 plaintiff put on the market a new razor called the "new improved" Gillette razor (Plaintiff's Exhibit 6), which was manufactured under the Wharton patent, No. 1,328,024 (Plaintiff's Exhibit 34). The problem due to damaged cap corners was considered prior to putting this razor on the market by a "new razor committee" in plaintiff's organization, but this committee was not able to find a remedy. The edges of the cap were made about 800 per cent. thicker than

those of the old one and the corners rounded in an endeavor to correct the defects mentioned supra. Nevertheless blade complaints increased. The evidence shows that although this new improved type razor was a better shaving instrument, due to improvements in its construction such as the fulcrum shoulders on the guard member, it increased the seriousness of the damaged cap problem because the corners of the blade broke off whenever the cap corners were damaged, and this was even a more serious problem for plaintiff, inasmuch as most users did not know that the blades broke because their razors were damaged but believed that the blades were defective. Moreover, there was great danger of the user cutting himself by using a blade without realizing that it was broken.

Shortly after the new improved type razor was put on the market, a "blade research committee" was formed by plaintiff with the object of studying the manufacturing problems of the company in order to improve its products. This committee considered the damaged cap corner problem and could not and did not find a solution. In 1924 and 1925, this committee recommended that the radius of the cap be changed and that the fulcrum shoulders be moved back a little nearer the center of the guard to prevent stresses in the blade. This change did not alter the situation.

These troubles with razors not only injured the reputation of the razors and blades sold by plaintiff, but put it to heavy expense. The several service campaigns and the recommended changes in the razor were quite costly.

After all these attempts to solve the problem of bad shaving and blade breakage, Thompson made the invention described in the patent in suit. He was familiar with the damaged corner problem during his long employment with the plaintiff and knew of the numerous complaints which the company received. Thompson made his invention in March, 1929. Awakening one night he conceived the idea of putting re-entrant recesses in the old-style Gillette blade, so that any injury to the corners of the cap would not spring the blade out of shape and thus force the edge out of proper shaving position or cause the corners of the blade to break off. The next day he conceived the idea of re-enforcing the corners of the cap by building up a lug on the underside of each corner, which lugs fit in the cut-out corners of the blade. These lugs re-enforce the cap corners and thus very much lessen the liability to injury. Thompson's solution of the problem

was complete and, at that, very simple, necessitating no changes at all in the razor construction but only in the blade contour.

The defenses relied on are:

1. Invalidity because of anticipation;

2. Invalidity for want of invention; and

3. Estoppel by the judgments in the former suits by plaintiff against defendant.

1. The prior art patents urged by the defendant are Wrede, No. 1,203,089; Ballreich, No. 1,246,219; Benn, No. 1,308,730; Zalduondo, French patent No. 431,191; Marchese, Canadian patent No. 173,126; and Gaisman, Australian patent No. 1,346, of 1926, but this patent is not discussed in defendant's brief, nor did the defendant call an expert to explain any of the prior art patents.

The patents to Wrede, Ballreich, Zalduondo, and Marchese were considered by the Patent Office Examiner during the prosecution of the original application of which the application which resulted in the patent in suit is a division; and the patent to Wrede and Ballreich were taken into consideration by the Examiner and also by the Board of Appeals of the Patent Office during the prosecution of the application which resulted in the patent in suit. It is always significant, when a defendant, after exhaustively searching for material with which to attack the validity of a patent, can point to nothing more pertinent than what the Examiner cited in the proceedings which led to the grant of the patent in suit, bearing in mind that the references not cited by the Examiner, namely, the Benn patent and Gaisman Australian patent, are far more removed from the patented invention, as will hereinafter appear, than the art on which the Examiner relied. The grant of a patent raises the presumption that the patented device is new, useful, and involves invention, and casts upon the one who denies it the burden of proving lack of invention. J. A. Mohr & Son v. Alliance Securities Company (C. C. A.) 14 F.(2d) 799, 800; Smith v. Goodyear Dental Vulcanite Co. et al., 93 U. S. 486, 23 L. Ed. 952; Diamond Rubber Co. of New York v. Consolidated Rubber Tire Co., 220 U. S. 428, 31 S. Ct. 444, 55 L. Ed. 527. This presumption has added force where the patents relied upon as negativing invention were considered by the Patent Office in the prosecution of the patent. J. A. Mohr & Son v. Alliance Securities Company, supra. While the judgment of the Patent Office officials is not absolutely binding on a court, it is entitled to great weight and convincing proof is necessary to show that they

were mistaken. This proof the defendant has not furnished.

It is also significant to note that all of the patents relied on by the defendant, with the exception of Zaluondo French patent No. 431,191, were urged by the defendant in the prior suit in this court between the plaintiff and defendant herein ([D. C.] 2 F. Supp. 64), which was based on letters patent No. 1,815,-745, granted on an application which was a division of the original application, Serial No. 358,114, above referred to. The prior suit involved contributory infringement, and while the judgment of this court was reversed on appeal, the patent was not declared invalid. In other words, and as I view it, the reasoning of this court as to the insufficiency of the prior art to invalidate the patent was left to stand.

While the new prior art patents are more remote than those cited by the Patent Office officials, and the presumption of validity of the patent arising from the fact that the nearest references were considered by the Patent Office has not been overcome by the defendant, nevertheless I consider it proper to deal with all the alleged anticipations to which defendant's counsel referred at trial, even including the Gaisman Australian patent which was not discussed in defendant's brief.

■ Defendant stresses the fact that the patent in suit was granted only after an appeal was made to the Board of Appeals in the Patent Office which first rejected the patent and then allowed the same only after two hearings were had, and characterizes plaintiff's efforts as "ant-like persistency" and charges plaintiff with having submitted affidavits containing misleading comparison drawings, which were also submitted to this court. I find nothing wrong with plaintiff's persistency in its attempt to secure a patent. I am also of the opinion that the presumption of validity of the patent was strengthened by the reversal by the Board of Appeals of its former decisions. Neither do I find any misleading statements in the affidavits submitted to the Patent Office Board of Appeals nor in the comparison drawings introduced in evidence in this court, Plaintiff's Exhibits 68 and 69.

■ An examination of the prior art leads me to the conclusion that there is nothing in it which shows a safety razor blade intended or conceived for the same purpose as that of the patented razor blade, nor does it appear in any of the prior art patents that the prior inventors even considered or had in mind the problem solved by the patentee. The patentee solved his problem by invention and not simply by his act as a skilled mechanic, and this is apparent as the art had been faced by the problem of damaged cap corners, bad shaving, and blade breakage for many years, and yet no one had solved it by following the teachings of the prior art. Inland Manufacturing Co. v. American Wood Rim Co. (C. C. A.) 14 F.(2d) 657, 659.

■ None of the defendant's citations anticipate the claims at issue since none give, in substance, the same knowledge and the same directions as the specification of the patent in suit. Skelly Oil Co. v. Universal Oil Products Co. (C. C. A.) 31 F.(2d) 427. An unappreciated use does not anticipate. Tilghman v. Proctor, 102 U. S. 707, 711, 712, 26 L. Ed. 279.

Taking up now the prior art patents in the order in which they are referred to in defendant's brief, I find that:

Wrede patent, No. 1,203,089, discloses a razor blade "provided with projecting ends 28 to rest upon the projections 20" of the guard member 18. With the projecting ends 28 of the blade and the projections 20 of the guard member co-operate lugs 24 on the cap member to insure proper positioning of the blade on the cap and guard. From this it appears that the lugs 24 on the cap corners of the Wrede device are blade positioning means. It also appears that when the Wrede blade is clamped between the cap and guard members of the razor, it is bent in a direction opposite to the one in which the Gillette blade is flexed by the corresponding razor elements. When increased pressure is exerted on the Wrede blade it springs the blade toward the cap member, increasing the amount of cutting edge exposure. The blade does not abut against the edges of the cap and is not supported by the cap edges. Consequently, if a corner of the Wrede cap is bent forward or deformed, the blade will not be broken or distorted. It is clear, therefore, that Wrede was not called upon to solve Thompson's problem because Wrede was never confronted with it and so was not acquainted with it. The specification of the Wrede patent does not refer to the problem which Thompson had before him. And the blade described in the Wrede patent was not conceived for the same purpose as that of the Thompson patented blade. I fully agree with the Patent Office Board of Appeals in their judgment that Wrede does not anticipate the Thompson blade. I do not overlook defendant's attempt to limit the claims relied upon by the plaintiff to a blade which has a thickness of 0.006 of an inch, having in mind that the Wrede

blade is considerably thicker. Inasmuch as defendant's blades, Plaintiff's Exhibits 2, 3, and 4, apparently have the same thickness as plaintiff's blades in evidence in this suit, this question seems to be immaterial. However, it may be noted that the claims, having reference to the specification, define blades having substantially the same order of flexibility as the original Gillette blades which are, as stated in the specification of the patent in suit, 0.006″ thick, so that the claims relied on must be held to cover blades of a flexibility adapted for use in a "Gillette-type" razor.

Patent No. 1,246,219, to Ballreich, discloses a razor which is not of the "Gillette type" because it does not include a separate guard member and a cap between the edges of which the razor blade is clamped, and by which the blade is supported adjacent its cutting edges to give rigidity to the blade. The Ballreich blade is a thick, rigid blade which does not require external support. The patent specifies on page 1, lines 21 to 24, inclusive, that one of the objects of the invention is the "production of a device in which a blade is used of such thickness as not to require external support to give rigidity to its cutting edge." The Ballreich razor comprises a combined cap and guard member which contacts with only one of the faces of the blade. Consequently, the blade can never be distorted by the combined cap and guard member. It follows that inasmuch as Ballreich was not faced with the problem which faced Thompson in the respect that he was never confronted with the problem of distortion or breakage of the blade by the deformation of the cap, he was not called upon to solve a problem with which he was unacquainted. True, if the Ballreich razor was dropped one of the corners of the combined cap and guard member might be bent. If it was bent away from its body portion, it would not affect the position of the cutting edge of the blade nor would it put additional stress on it. On the other hand, if the corner was bent toward its body portion it would prevent mounting the blade on the combined cap and guard member. The record shows that the Ballreich patent was considered against the Thompson application and fully considered by the Board of Appeals of the Patent Office as appears from Defendant's Exhibit 5, the file wrapper of the patent in suit, and the Board allowed some of the claims over the Ballreich patent at the original appeal. The unbiased opinion of the experts of the Patent Office carries more weight than the statement of defendant's attorney who cannot be subjected to cross-examination.

Benn, No. 1,308,730, discloses a blade having projections 15 at its ends "to facilitate the handling of the blade in assembling the same." While recesses are formed in the blade corners, these recesses do not co-operate with the razor cap. As a matter of fact, the drawings clearly disclose that if a cap corner of the Benn device is bent the recesses would not prevent the blade from being distorted. Consequently, it must be held that the Benn construction does not suggest the Thompson invention.

Zalduondo French patent, No. 431,191, was before the Patent Office Examiner and was found not to anticipate. On this patent defendant's brief suggests that: "It is not necessary to discuss specifically the French and Canadian patents cited, except to point out that each discloses the patented structures and that the blade in each is as thin or thinner than the Thompson blade. The French patent to Zalduondo specifies a blade thickness of 0.004 of an inch." I find that this patent does not disclose the patented structure. The juxtaposed faces of the cap and guard of Zalduondo are concave and convex respectively, so that the diagonal cuts in the corners of the blade are narrowed, that is to say, the edges along those cuts approach one another so that a bent cap corner will rest against the blade and two of the cap edges will produce an uneven edge exposure of the blade, a feature which Thompson intended to avoid. There is nothing in the specification which suggests the Thompson invention.

Marchese Canadian patent, No. 173,126, describes a blade having a projection 9 on each end to fit recesses 7 in each end of the guard member 2 by which the blade is positioned with relation to the guard. The blade has no internal positioning apertures and, therefore, does not come within the terms of the claims relied upon by the plaintiff. Injuries to the cap corners of the Marchese razor have the same effect as injuries to the cap corners of the original type Gillette razor.

Gaisman Australian patent, No. 1,346 of 1926, shows in Fig. 1 a razor of the Gillette type in which a blade is curved at its ends so that the cap corners project beyond the blade structure. Defendant asserts that the blade of the Gaisman patent "is curved and cuts inwardly to avoid" the cap corners. I find nothing in the patent to justify such a statement, nor is there anything contained in the specification which describes or even hints at the co-operation of a blade corner and a cap corner. Courts are very reluctant to find anticipation in earlier descriptions unless it is

complete and precisely stated, and this is particularly true of foreign patents. The Gaisman specification does not give in substance the same knowledge and same instruction as the specification of the patent in suit, and on the evidence in this case, read in the light of the rule of law applicable to anticipation, I do not find the invention of the patent in suit anticipated by the Gaisman Australian patent.

█ This record clearly shows that the problem of preventing unsatisfactory shaving and blade breakage was well recognized quite some time before the Thompson invention, and it further shows that Thompson succeeded where others had failed. The principle of law, here applicable, is well stated in Acme Card System Co. v. Globe-Wernicke Co. (D. C.) 23 F.(2d) 523, at page 525, where Judge Lindley said: "We well know that, if a particular result was frequently sought and never attained, want of invention cannot be predicated upon a device or process which first reached that result, merely because the simplicity of the means appears to be such that many believe they could have readily produced it, if they had tried to do so."

This follows the well-established rule pronounced by Judge Donahue, speaking for the Circuit Court of Appeals for the Sixth Circuit in Inland Mfg. Co. v. American Wood Rim Co., 14 F.(2d) 657, at page 659, where the doctrine was expressed in the following language: "It is no argument against invention that the inventor availed himself of all knowledge known to mechanics skilled in the art, nor is it surprising that, when a definite result has been accomplished, the simplicity of the methods by which it is accomplished would seem to be obvious. The line between the skilled mechanic and the ingenuity of the inventor cannot be accurately drawn in any given case, but where a demand has long existed, and men skilled in the art have sought to meet that demand without success, the argument that the methods employed by the inventor who has solved the problem are so obvious as to involve only mechanical skill, is not entitled to very serious consideration."

See, also, Diamond Rubber Co. v. Consolidated Rubber Tire Co., 220 U. S. 428, 429, 434, 31 S. Ct. 444, 55 L. Ed. 527; Consolidated Brake-Shoe Co. et al. v. Detroit Steel & Spring Co. et al. (C. C.) 59 F. 902, 908; Star Brass Works v. General Electric Co. (C. C. A. 6th) 111 F. 398, 400; American Ball Bearing Co. v. Finch (C. C. A. 6th) 239 F. 885, 889.

█

█ It is a well-settled rule that a patent for a mechanical combination is not anticipated by a drawing in a prior art patent which incidentally shows a similar arrangement of parts, when such arrangement was not designed or used to perform the function which it performs in the second invention, and where the first patent contains no suggestion of the way in which the result sought is accomplished by the second invention. Now, granting that some of the prior art patents show blades which have a contour similar to that of the Thompson patented blade, it is apparent that such contour was not designed nor was it used to perform the function which it performs in Thompson's patented blade, and an examination of the specifications of the prior art patents discloses the fact that these prior art patent specifications contain no suggestion of the way in which the result sought by Thompson was accomplished.

2. The second defense is want of invention. Defendant treats this subject throughout its brief in such a light vein that I must conclude that this defense is not to be taken seriously or else that defendant is of the belief that this suit should be laughed out of court.

█ But, let us examine the facts and the law applicable to the subject. To my mind the conception of an invention involves three distinct steps: First, consideration of the problem to be solved; second, grasping the general principle to be applied in solving this problem; and, third, selecting the particular means used in solving the problem. If the problem to be solved is known, as it was in the Thompson case, the merit of the invention may lie either in the choice of the method for overcoming the difficulty or in the means for doing so, but it is not necessary that the means should be new in themselves if the method is new. In the case at bar, the method of overcoming the difficulties experienced, that is, bad shaving and blade breakage, is without doubt novel although, generally speaking, placing notches in a blade was old and applying fillets in recesses is also an old expedient.

Thompson's solution of the problem was as simple as it was complete. To say now, after its accomplishment, that the solution was obvious is to suggest that hindsight is quite different from foresight.

What seems really to trouble the defendant is the simplicity of the invention. But, then, simplicity is not the test of invention.

As the Supreme Court said in Expanded Metal Co. v. Bradford, 214 U. S. 366, 381, 29 S. Ct. 652, 655, 53 L. Ed. 1034: "It is suggested that Golding's improvement, while a step forward, is nevertheless only such as a mechanic skilled in the art, with the previous inventions before him, would readily take; and that the invention is devoid of patentable novelty. It is often difficult to determine whether a given improvement is a mere mechanical advance, or the result of the exercise of the creative faculty amounting to a meritorious invention. The fact that the invention seems simple after it is made does not determine the question; if this were the rule, many of the most beneficial patents would be stricken down. It may be safely said that if those skilled in the mechanical arts are working in a given field, and have failed, after repeated efforts, to discover a certain new and useful improvement, that he who first makes the discovery has done more than make the obvious improvement which would suggest itself to a mechanic skilled in the art, and is entitled to protection as an inventor." There are numerous decisions to the same effect. Some go so far as to see invention just because, being so simple, it had not occurred to any one before. H. C. White Co. v. Morton E. Converse & Son Co. et al., 20 F.(2d) 311 (C. C. A. Second Circuit).

In my opinion Thompson's invention is to be praised and not condemned because it is so simple. Its very simplicity enhances rather than detracts from its inventive character.

Judge Grosscup, in Faries Mfg. Co. v. George W. Brown & Co., 121 F. 547, 550, speaking for the Circuit Court of Appeals for the Seventh Circuit, expressed the idea which I think is very pertinent here in the following way: "The eye that sees a thing already embodied in mechanical form gives little credit to the eye that first saw it in imagination. But the difference is just the difference between what is common observation and what constitutes an act of creation. The one is the eye of inventive genius; the other of a looker on after the fact."

In the very recent case of United Shoe Machinery Corp. v. E. H. Ferree Co. et al., 64 F.(2d) 101, 102, the Court of Appeals for this circuit, speaking by Judge Manton, expressed the rule as to the point under discussion as follows: "The fact that it may be regarded as a simple change of material does not take away the merits of the patentee's accomplishment. Prior inventors were trying to take care of the objectionable features of the heavy cast-iron arm and did not

think of the use of aluminum alloy. This supports the claim of invention. That the art needed a lighter arm gave rise to an incentive which spurred others to work on the problem, and because, after its accomplishment, it seemed so simple, does not defeat the claim of invention."

See, also, C. & A. Potts & Co. v. Creager, 155 U. S. 597, 608, 15 S. Ct. 194, 39 L. Ed. 275; Webster Loom Co. v. Higgins, 105 U. S. 580, 591, 26 L. Ed. 1177; H. C. White Co. v. Morton E. Converse & Son Co., 20 F.(2d) 311, 313 (C. C. A. Second Circuit).

Speaking further, Judge Manton said: "One of the safe tests of patentability is to inquire as to the condition of the art and the call for improvement." Dubilier Condenser Corp. v. N. Y. Coil Co., 20 F.(2d) 723, 725 (C. C. A. Second Circuit); R. Hoe & Co., Inc., et al. v. Goss Printing Press Co., 30 F.(2d) 271, 274 (C. C. A. Second Circuit).

Certainly in the present case, where the problem defied any solution by those most competent to solve it for many years, there can be little doubt that the solution involved invention. I conclude, therefore, that defendant's second defense is without merit.

3. We now come to the third defense, which is rather unusual. Defendant contends that plaintiff is estopped by the judgments in the former suits, Gillette Safety Razor Co. v. Standard Safety Razor Co., on Letters Patent No. 1,815,745 and No. 1,858,316, from contending here that placing recesses in the corners of flexible safety razor blades of the "Gillette type" does involve invention, admitting however that the present action is upon a different claim, the patent in suit not having issued at the time the former judgments were rendered.

In the suit which was based on letters patent No. 1,815,745, which contains claims for the Thompson razor but no blade claims, the question turned on contributory infringement. The Court of Appeals decided, 64 F.(2d) 6, that there was no contributory infringement, stressing the fact that the blade itself was not patented. It made no finding which estops the plaintiff from contending here that the Thompson blade, which has now been patented, involved invention. The Court of Appeals did not pass upon the validity of the combination claims of the earlier Thompson patent, No. 1,815,745; it did not hold that Thompson did not make an invention in the razor or blade or in the combination thereof notwithstanding the fact that defendant urged not merely that the blade

was unpatented but also that it was unpatentable.

The second prior suit was based on the Thompson patent, No. 1,858,316, which contained blade claims and those relied upon in the suit were declared invalid by the Circuit Court of Appeals 64 F.(2d) 9. This patent was not based upon the inventions of either of the Thompson patents, but upon a later joint invention of Thompson and Smith. The blade claims of the Thompson and Smith patent were for the Thompson and Smith long-slot blade, and not for the Thompson blade. The Thompson invention of the recessed corner blade of the patent in suit herein was prior art as against the Thompson and Smith blade, as stated by the Court of Appeals. While the Court of Appeals held that the Thompson and Smith blade is unpatentable over the Thompson blade, it in no way indicated that it considers the Thompson blade of the patent in suit herein unpatentable. Hence no estoppel can be spelled out of the Court of Appeals decision on the Thompson and Smith patent.

Defendant seems to argue that it is entitled to make the blade of the patent in suit herein because the Court of Appeals held that it is entitled to make the Thompson and Smith blade, losing sight, however, of the fact that at the time of the judgment there was no patent on the Thompson blade per se and that the application for the patent in suit herein antedates the application for the Thompson and Smith patent, and that the invention of the latter was admittedly made after the Thompson invention. Consequently plaintiff is not estopped from asserting its rights in this suit. To prevent it from relying on the patent in suit herein would amount to confiscation of property without due process of law.

The Thompson and Smith blade infringes the claims relied upon in this suit. This is admitted by the defendant because Plaintiff's Exhibits 2, 3, and 4 are Chinese copies of the Thompson and Smith blade. Defendant seriously contends that, having been permitted to make this blade, it should have the right to continue to do so in order that it may furnish blades for all types of Gillette razors. When defendant continued to manufacture and sell these blades after it received due notice of the issue of the Thompson patent in suit herein, it took a chance that every infringer takes, although it is in a position to manufacture and sell noninfringing blades, such as the old-type Gillette blades, as it did during the time that it was under an injunction in the prior suits. Business interests offer no excuse for invading the property rights of others.

For the reasons given and upon the authority of the cases cited and quoted from, it follows that claims 1, 3, and 4 of the Thompson patent in suit must be and hereby are held to be valid and infringed.

Submit a decree, properly consented to as to form, providing for injunctive relief as well as directing a reference to a master for an accounting, together with a separate order making the above and foregoing the findings of facts and conclusions of law. Costs to be taxed in favor of the plaintiff.