## GILLETTE SAFETY RAZOR CO. v. ESSEX RAZOR BLADE CORPORATION.

District Court, D. New Jersey.

Dec. 21, 1935.

Pitney, Hardin & Skinner and Charles Hardin, all of Newark, N. J., and Merrell E. Clark, of New York City, for plaintiff.

C. M. Palmer, of Pottsville, Pa., and Saul Lehr, of Elizabeth, N. J., for defendant.

CLARK, District Judge.

This court approaches the writing of this opinion without any particular enthusiasm. This for several reasons. In the first place, we rather thought we had already discharged our duty in the premises "many long months ago." The original hearing took place on October 25, 1934. Final argument followed on October 29th, and at the conclusion thereof we gave verbal utterance to our views (record pages 96, 97). At those times we were attended by one member of the well-known firm who represents the plaintiff company. Thereafter and on April 24, 1935, there was further argument with respect to the form of the models which should be submitted on the inevitable appeal. At that time we were attended by a different member of the same distinguished firm. In the course of the discussion, this different member gave us the impression that he had a poor opinion of our competence patent wise, so to speak. This was the more humiliating because the improvement, if any, as will later appear, was of the most child-like simplicity.

In the second place, we observe with distaste the economic situation disclosed by the record. The defendant company was organized by former employees of the plaintiff. Previously to their organization of the defendant company, they had been employed by another razor blade manufacturing company, the Clark, which seems to have warred with the Gillette Company since the inception of the art. Gillette Safety Razor Co. v. Clark Blade & Razor Co. et al. (C.C.) 187 F. 149, and Clark Blade & Razor Co. v. Gillette Safety Razor Co. (C.C.A.) 194 F. 421. The scene of the latest skirmish in this warfare was in our courtroom and subsequent to our dismissing this bill. The plaintiff in this suit was defendant in a Sherman Act (15 U.S.C.A. § 15 note) triple damage action brought by the Clark Company. We were constrained to nonsuit because we felt that the Clark Company had not proved its damage. We say constrained not politely but advisedly. The practices of the present plaintiff as there revealed seemed to us to contravene not only the Sherman Act but broader principles of fair competition. The practice cognate to the present litigation was the plaintiff's use of patents in the razor blade art. Gillette Safety Razor Co. v. Hawley Hardware Co. (D.C.) 60 F.(2d) 1019, and Gillette Safety Razor Co. v. Hawley Hardware Co. (C.C.A.) 64 F.(2d) 10. That use was fully exploited in the record of the suit above referred to and need not, therefore, be repeated here. This method of unfair competition was the subject of extensive testimony at the time of the Oldfield Hearings on the revision of the patent law. We quote two witnesses:

"As to wealthy corporations, it has become obvious that the skillful handling of patent cases places them at an untold advantage against their smaller competitors. For them, a well-organized patent department is a reliable machine, where money is the lubricant. This machine, in its slow but sure grinding way, can reduce to pulp any of the smaller competitors. For large corporations the maintenance of such a machine with a staff of lawyers and experts, is merely a small side expense. By its aid they can bluff their weaker competitors into quick submission. If this is not successful, they can drag out a patent suit indefinitely, until the weak opponent unable to bear the ever-increasing expenses, collapses and withdraws.

"These tactics are well-known, and have been played successfully, whether it was to uphold the worthless patent or to obtain immunity in case of infringement. In every case the wealthy corporation is sure of the outcome of the game, and plays, 'Heads I win, tails you lose.'" (Oldfield Hearings of 1912, No. 4, p. 34.)

"There is no present requirement that a suit under a patent be brought in good faith. It not infrequently happens that the owner of a patent beings suit against a perfectly innocent defendant, puts him to expense, worry, and general harassment in his own defense, and injures his business; and it is finally found by the court, when the case is concluded, that the defendant has not infringed any valid claim of the patent sued upon. Under the present system, as far as I know, the defendant can recover nothing but his court costs, which represent a very small portion of the expense to which he has been put in his defense." (Oldfield Hearings of 1912, No. 15, p. 6.)

Such a spirit and its practical application are bound to react upon the consciences of those whose economic status compels them to participate therein. Accordingly, it is not surprising to find the Gillette Company's former employees working for and even organizing companies whose sole purpose is alleged to be the infringement of the plaintiff company's patent monopoly.

In the third place, we are again forced to dispair of the Patent Office. That dispair has become so chronic with us that it would seem to call for a major operation either upon us or upon the office. The cause of our tears this time is not new. It is simply the examiner's failure to find the anticipating patent, or rather we should say the patent both sides agree is most relevant, Hartman No. 1,247,266, November 20, 1917. Perhaps again the explanation is the same as that received in the case of a patent for manufacturing rope, namely, that the missing patent had through capillary action, no doubt, adhered to another and had, therefore, been overlooked.

To return to our in the first place. We are quite ready to concede the paucity of our scientific equipment. In many arts we have been faced and will no doubt again be faced with abstruse and intricate problems requiring a high degree of scientific understanding. We can only hope that our industry has made up and will make up for our lacking of training and intelligence. Counsel's estimate of both these last is evident from a statement of the patent and the asserted anticipation.

Like many devices, the safety razor makes use of a description that does not describe. We want to be clean and want to be safe so we buy safety razors and prophylactic tooth brushes. As a matter of fact, the guard may make the razor useless for "social purposes," but furnishes no more protection than the least skillful user of the old style instinctively gives himself. In other words, the cuts of the so-called safety razor cannot be fatal. Neither do we remember hearing of any deaths while shaving with an old-fashioned razor.

We do not mean by this to deny the present day safety razor. That merit happens to have, however, no relation to its name. It is what gave Mr. King C. Gillette both his patent and his fortune (one of the rare instances of such concurrence). The maintenance of a cutting edge on a razor is both essential and with any thickness of steel troublesome and expensive (stropping and honing). The Gillette touch of genius was the use of blades "made of sheet steel having preferably a uniform thickness of almost six one thousandths of an inch." Incidentally, counsel in the present case seemed to credit this touch of genius to one France, an employee of Gillette, rather than to King C. Gillette himself.

The new blade was fitted into the more or less old mechanism. The principal feature of this old mechanism was an overlapping clamp which cut down the field of the cutting edge and thereby afforded the necessary protection. To hold the two parts of the clamp (now apparently designated the cap and the guard) together, a screw projected from the cap through the blade and guard and was screwed into the handle of the razor. If only a screw in the center were used, the blade would fit loosely at the ends. To provide against this, the original Gillette had two additional conical protuberances made part of the cap and fitted into holes in the blade and the guard. These, in the jargon of both Patent Office and patent counsel, are described as "positioning means" and again in their jargon gave more precision to this instrument of precision and permitted greater manufacturing tolerance. The "improvement" of the Hartman patent was to shift these additional protuberances from the cap to the guard. This distribution of the "interlocking" means we concede might make for greater snugness as it constituted a distribution of stresses. We should have hardly thought it beyond the grasp of the ordinary mechanic.

There was in the art another patent to Thompson which, although not cited in the Patent Office or by defendant's counsel, is interesting. The use of this patent was included in the unfair competition complained

of by another independent razor company, the triple damage suit in this court. The improvement there was the recessing of the four corners of the blade. In an eloquent passage, an officer of the defendant company attributed the ratio decidendi, so to speak, for this practice to the "burrs" on the cap occasioned by dropping the razor around the bathroom. We have a feeling that the said officer exaggerated the matutinal condition of the average shaver. However that may be, the recesses prevented the burrs from touching and so spoiling the blade.

This time the courts or rather the court that counts was on the side of the ordinary mechanic. The District Court found for the patent, Gillette Safety Razor Co. v. Standard Safety Razor Corporation, 8 F. Supp. 251. The Circuit Court of Appeals for the Second Circuit, Gillette Safety Razor Co. v. Standard Safety Razor Corporation, 74 F.(2d) 691, in reversing said:

"The simplicity of accomplishing this result or, in other words, solving the problem, required no inventive thought. The type of blade was not new. If anything, all that was new was the cutting of the recesses in the corners, that is, cutting the corners of the flexible blade used for the Gillette-type safety razor. As we said in Gillette Safety Razor Co. v. Standard Safety Razor Corporation, 64 F.(2d) 9, 'it was the obvious and inevitable thing to do to cut the blade to fit the bar.' So it was here necessary to cut the blade to accommodate the lugs." 74 F. (2d) 691, at page 692.

And see, also, Gillette Safety Razor Co. v. Standard Safety Razor Corporation (D. C.) 2 F.Supp. 53, and Gillette Safety Razor Co. v. Standard Safety Razor Corporation (C.C.A.) 64 F.(2d) 9.

To this we say amen in the case at bar. And we say so the more fervently because the learned presiding judge of this court has already characterized the art [American Safety Razor Corporation v. Frings Bros. Co. (C.C.A.) 62 F.(2d) 416]:

"Turning then to the question whether the supply blade of defendant infringes plaintiff's patent rights, we note that the safety razor art is a thoroughly occupied field. Originally novel and radical in character and for years the subject of patentable novelty and the source of large profits, the field has been thoroughly developed, and as a result thereof and the employment of skilled engineering in its progress, improvement and development are naturally to be looked for. Moreover, courts in dealing with an art, originally pioneer in origin, must carefully scrutinize the constant efforts of those who have enjoyed a profitable patent monopoly to lengthen such monopoly by patents for non-inventive changes." 62 F.(2d) 416, at page 417.

It is true that Gaisman did more than advise four artificial recesses to avoid accidental burrs. He recommended artificial burrs to fit into the recesses. He claims greater closeness of fit and greater precision because of these additional positioning means. Let him claim it. We do not think his claim should be crowned by a patent.

In conclusion, let us say that we still do not perceive in what regard we misunderstand this invention. Trial counsel agreed that we grasped his contention. The record shows the following colloquy (record pages 37, 38):

"The Court: * * * Then your invention consists in putting four little protuberances on the top of each corner of the top and fitting them into corresponding niches in the blade?"

"Mr. Clark: To the extent that that makes possible this blade positioning to which I have referred."

"The Court: But that's the way it is done?"

"Mr. Clark: That's the way it is done. It is the first time that has been done."

Perhaps appellate counsel will make our ignorance plain both to us and to the court above.