## GILLETTE SAFETY RAZOR CO. v. ESSEX RAZOR BLADE CORPORATION.

### No. 5760.

Circuit Court of Appeals, Third Circuit.
March 5, 1936.

Henry R. Ashton, of New York City, and Pitney, Hardin & Skinner, of Newark, N. J., for appellant.

C. Palmer, of New York City, and Saul Lehr, of Elizabeth, N. J., for appellee.

Before BUFFINGTON, DAVIS, and THOMPSON, Circuit Judges.

BUFFINGTON, Circuit Judge.

This case concerns the art of Gillette safety razors. We are so familiar with the use for years of such razors that it is hard for us to conceive there could now be any marked improvement therein. The original Gillette patent was before this court in Clark Blade & Razor Co. v. Gillette Safety Razor Co., 194 F. 421. In a later case, American Safety Razor Corporation v. Frings Bros. Co., 62 F.(2d) 416, 417, this court noted "that the safety razor art is a thoroughly occupied field. Originally novel and radical in character and for years the subject of patentable novelty and the source of large profits, the field has been thoroughly developed, and as a result thereof and the employment of skilled engineering in its progress, improvement and development are naturally to be looked for." Adhering to those views, we approach the questions involved in the present case and inquire first whether the patentee, Gaisman, disclosed anything useful and a material improvement in the razor art; and secondly, if so, was it merely the engineering progress incident to, and to be expected in, that art, or was it such a departure along new lines as to amount to invention? As the opinion of the trial judge was not printed in the record, we here refer to it, 13 F.Supp. 505, and make it part of the record.

In Clark Blade & Razor Co. v. Gillette Safety Razor Co., 194 F. 421, 422, two propositions were by this court determined: First, that "a ribbon or wafer razor-blade, so thin as to require external support of its cutting edge, was original with Gillette"; and, second, his claim for such a blade was not invalid, because the blade was not per se operative, but, citing authorities, we held: "As to our fifth conclusion, we note it should be added that claim 2 is not invalid because not for an operative device, for, if such were the law, patentability must have been denied to Elias Howe for 'the grooved and eye-pointed needle' which constituted his seventh claim."

Based on this holding, the Gillette Company enjoyed, until their patent expired, a monopoly of their so-called safety razor. We say "so-called safety razor," for in point of fact it was not a safety razor, as the experience of users of this original Gillette razor has been that they have cut themselves on it quite frequently and now continue to do so. Indeed, the statement of the trial judge, "I generally cut myself," is the experience of all of us safety razor users. During the eighteen years that have passed between the year 1904, when the Gillette patent was granted, and 1922, when the problem of a non-face cutting razor was solved, no one solved, or indeed recognized, that problem, although this record is replete with patents many in number, evidencing attempts to improve the safety razor.

Indeed, the only attempt in the line of safety is the patent of Fretwell, No. 1,467,-930, considered by this court in Fretwell v. Gillette Safety Razor Co., 78 F.(2d) 868, the object of which was to provide a blade of such character "that in the event of an insane person seeking to pick at the blade with a view to removing the same, the blade will be broken into fragments and rendered unfit for use." But this patent, as also that of Hartman, left no impress on the art and were but abortive conceptions with no factory birth or sales maturity.

Curiously enough, the solution of safety came not from the efforts of the Gillette engineering staff in an attempt to extend the monopoly of its expiring patent, but from a competing company. The latter's president, Gaisman, was an experienced razor man. His first effort to improve safe-

ty razor blades was his patent No. 1,011,-938, which had aimed to reduce the breaking of blades when bent, by tempering the outer or cutting edge of the blade to the desired degree and annealing or tempering to a lower degree the central longitudinal portion. The object of such treatment was "to permit the blade to bend or to curve between the longitudinal edges without danger of breaking or cracking." While this patent is not here involved, it is of interest as showing Gaisman's first effort to improve was along the line of preventing blade breaking and not preventing blade cutting of the face. It is also of interest as showing for the first time in the art the pictorial idea of a square opening in a blade but to which no function was attributed.

On November 21, 1922, when Gillette's patent for the flexible blade had expired, Gaisman applied for, and was granted, patent No. 1,633,739, here in suit. From his specification we see his object was to improve the thin, ribbon-like strip of the Gillette razor which he was now free to use. This is shown by the first nineteen lines of the specification. He there points to the fact that in that type of razor "the blade and the backing are retained from rotation on the guard by the cooperation of said pins with the guard and the clamping of the blade between the guard member and the backing member, *so that the blade performs no function in retaining any of said parts with relation one to another.*"

We here note, as above stated, that in this Gillette type of razor Gaisman sought to improve, the blade was a passive, noncontrolling and nonoperating element in fixing, determining, or maintaining the relation of the backing member and the guard member, and that his invention was in now making the blade the dominating and exclusive factor which positioned, maintained, and kept in proper cutting position, first, the backing member; second, the guard member; and, third, the proper cutting edge of the blade itself. This he set forth in his specification in simple clearness, viz.: "The object of my invention is to provide a safety razor wherein a blade will cooperate with a guard member to retain the blade in shaving relation thereto and the blade will also cooperate with a backing member to retain the latter in proper relation to the blade for shaving purposes, so that the position of the backing member with regard to the guard member is maintained by the blade and not

by the cooperation of said members together in the well known manner I have described above."

That no one had done this, or even conceived this, before, is clear, but its significance and effectiveness in making the Gillette Razor a non-face cutting and an actual safety razor is not apparent at first sight.

Addressing ourselves to a study thereof, we note the basic fact that the cutting edge of the blade must be accurately placed initially with reference to the guard that when so placed or positioned, the guard will keep the cutting edge from being so far forward as to cut the face and yet from being so far back that it will not cut the beard. Now this position zone between face cutting and nonshaving has been accurately determined and is proven without any contradiction by the production engineer of the plaintiff as follows:

"Q. To what extent is a safety razor a precision instrument, Mr. Smith? A. It is a precision instrument because it must be made so that there is the least *possible variation* in blade exposure.

"Q. What are the limits that you found possible commercially or desirable commercially? A. Blade exposure must not be less than zero nor preferably more than 8-1/1000 of an inch."

It therefore follows that the usable, permissible, workable position zone within which the blade will cut the beard, and not cut the flesh, is the almost microscopic zone of 8/1000 of an inch in breadth. Outside of that zone the blade will either flesh-cut or non-hair-cut, and the zone is so narrow that it cannot be located by sight or determined by touch. Indeed, as the diameter of a hair is 1/250 of an inch, which is equivalent to 4/1000 of an inch, the width of the proper cutting position zone may be aptly described as a "hair breadth." From this it follows that if it is done, the razor must necessarily automatically do two things, first, locate the cutting edge of the blade initially in this microscopic safety zone, and, secondly, must immovably hold it there during the shaving operation. And if the patentee's device so acts as to effect these two things, the device would seem to be of high merit, an important advance, and one worthy of patent protection. If after having gotten the proper cutting edge of the blade, it were to be soldered or fastened in that position, that might solve the problem,

but you cannot do that in a razor. It must be capable of being taken apart and put together often and speedily. To do this rapidly and safely, the parts must not be too rigidly or too firmly attached. These facts created another necessary factor for which due allowance must be made and counteracted, that is the element called "tolerance," which created a limited freedom of motion, movement or "slack." This tolerance problem was met by the patent in suit. To illustrate: The uncontradicted proof in that regard is as follows: "In an old style Gillette razor the two outer pins on the cap positioned both the blade relative to the cap and the guard relative to the cap. In order that the blade shall fit on the studs and that the guard shall fit on these studs, the holes have to be somewhat larger than the pins. In this arrangement it is possible for the blade to move in one direction, to take up the clearance between the large holes and the small studs, and for the guard to move in the opposite direction. The result is that the amount of blade exposure which is an important characteristic of the safety razor may vary on account of this necessary looseness by about 5-1/1000 of an inch."

Remembering the testimony earlier quoted that the zone of movement of the cutting edge was but 8/1000 of an inch, we can see that when thus limited 8/1000 of an inch of allowable blade exposure was still subject to 5/1000 shift due to the "tolerance" factor, and consequently the proper cutting edge exposure might be thus changed to an over or under exposure position. And the difference between the old type Gillette blade and the Gaisman blade is proven without contradiction, viz.: "There is only a 3-1/1000 of an inch, a reduction as compared with the Gillette method of positioning of 2-1/1000, or 40 per cent." The effect of this 2/1000 reduction is established by the uncontradicted proof, which is:

"Q. And do I understand correctly that allowing the same manufacturing tolerance for the two types of structures you will get more accurate determination of the blade exposure with the Gaisman construction than with the old Gillette construction? A. Yes, sir, 40 per cent. more accurate as far as those features are concerned.

"Q. So by the same token you might allow greater manufacturing tolerances with the Gaisman construction and still get as good results as with the old Gillette construction, is that correct? A. Yes, sir.

"Q. Which would be cheaper?* A. Yes, sir."

The Gaisman device and how it operates and overcomes these difficulties is clearly and tersely set forth in the specifications as follows: "In carrying out my invention I provide a guard member and a blade having cooperative means to retain the blade in shaving position on the guard, a backing member for the blade, means cooperative between the blade and the backing member whereby the blade retains the backing member in operative relation to the blade and the guard, and means to cause the guard member and backing member to clamp the blade therebetween."

The details of its operation, the Goodwill razor in which the plaintiff embodies the

---

* It is to be noted that while Judge Thomas' decision in 60 F.(2d) 1019, was reversed in 64 F.(2d) 10, alone on the ground of non-infringement, his conclusions on patent validity were not questioned. As evidencing his estimate of the Gaisman patent, his accurate and lucid statement is here quoted:

"The principal utility of the Gaisman invention lies in the fact that it permits less accurate standards of manufacture while maintaining equal accuracy of positioning the cutting edges of the blade with relation to the cap and guard member of the razor. The accumulated error which is possible in the Gaisman razor is less than the accumulated error of the 'old style' Gillette razor. It appears from the evidence that the Gaisman principle reduces the variation of the blade cutting edge exposure approximately one-third or,

if the same tolerance and clearances are maintained, the Gaisman principle improves the average qualities of the razor by about one-third.

"Plaintiff's witness T. L. Smith, the production engineer, testified that the greater the tolerance, the lower the cost, and that the greater the precision required, the greater the cost of manufacture. If the tolerances are reduced one-third, the costs would perhaps be doubled (pages 310, 311), and there is no controversion of this testimony in the record. Therefore the effect of the Gaisman invention is either to permit manufacture with less accurate measurements of a razor which will shave satisfactorily or, if the same accuracy is maintained, to produce a more accurate, and therefore a better shaving instrument."

Gaisman patent which it has acquired, and the defendant's alleged infringing blade, are all set forth in the accompanying illustrative sketch:

of the four corners of the blade which are entered by the four projections 6 on the cap. The screw-threaded spindle 4 on the cap passes through the center of the blade and

GUARD OF RAZOR OF GAISMAN PATENT

GUARD OF GILLETTE GOODWILL RAZOR

BLADE OF GAISMAN PATENT

DEFENDANT'S BLADE

CAP OF RAZOR OF GAISMAN PATENT

CAP OF GILLETTE GOODWILL RAZOR

And the plaintiff's brief correctly states in language which we adopt, viz.:

"The guard of the Gaisman razor is provided with a diamond shaped (non-circular) projection 1b. The blade is provided with a complementary opening 2a which fits over the projection 1b. This positions the blade, and consequently also its cutting edges accurately with respect to the teeth of the guard. With the blade thus accurately positioned on the guard, the next step is to position the cap accurately with respect to both the blade and guard. This is accomplished by means of the four recesses 2b near each

through the opening 8 in the guard and serves merely to draw the parts together when the razor handle is screwed up. The two ends of the guard are cut away at 7 so that there is no engagement whatsoever of the cap projections 6 with the guard. And, similarly, there is no engagement whatsoever of the guard projection 1b with the cap, the central zone 3a of the cap being recessed to prevent any such engagement.

"Thus it clearly appears that the blade is the sole connecting link between the guard and cap of the razor and it serves, because of its engagement in its central area with

the projection 1b of the guard and its engagements at its four corners with the projections 6 of the cap, as a key whereby the guard and cap are both accurately positioned with respect to each other and also with respect to the cutting edges of the blade.

"Exactly the same is true of defendant's blade as used in the Gillette Goodwill razor. Referring to the righthand column of the Exhibit, it will be seen that the guard is provided with two, instead of one, diamond shaped (non-circular) projections 1b over which fit the complementary openings 2a in defendant's blade. These two projections 1b on the guard and the openings 2a in the blade position, and consequently also its cutting edges, accurately with respect to the teeth of the guard. Similarly the cap is positioned accurately with respect to both the blade and guard by means of the four recesses 2b at each of the four corners of the blade which are entered by the four projections 6 on the cap. Also, as in the Gaisman razor already described, the screw-threaded spindle 4 on the cap passes through the opening 8 in the guard and serves merely to draw the parts together when the razor handle is screwed up. The guard of the Goodwill razor is likewise cut away at 7 so that there is no engagement whatsoever of the cap projections 6 with the guard. Nor is there any engagement between the projections 1b of the guard and the cap, the cap being cut away at 3a to prevent any such engagement."

Such being the case, it will be seen that Gaisman's disclosure warranted the grant of his claims, viz.:

"1. A blade having a non-circular opening, substantially centrally disposed to retain the blade in shaving relation to a guard member, said blade having means spaced from said opening to cooperate with a clamping member to retain the latter in shaving relation to the blade independent of the guard member.

"2. A blade having an angularly shaped opening disposed substantially centrally in the blade to cooperate with a guard member to retain the blade in shaving position thereon, and said blade being provided with means spaced from said opening to cooperate with a backing member to retain the latter in shaving relation to the blade and to the guard member."

This combination was, as a whole, new in the art. By its blade, through its corner slots, co-operating with the four studs of the cap or backing and by the blade's angular, noncircular opening co-operating with the angular, noncircular projection of the guard on the other member, the hitherto passive, flexible blade of the old Gillette razor became the dominant factor which mechanically determined the initial and safe position of the cutting edge and mechanically held it in that safe and efficient position, rigidly and without variance or shadow of turning. For the first time in the art it produced a safe, non-face cutting Gillette razor, and the fact that, as shown by the uncontradicted proofs, millions of such new razors have been made and sold by the plaintiff, demonstrates its worth. That the defendant's blade is substantially a copy of Gaisman's device is clear. The defendant makes no razor of its own, it is usable on plaintiff's Goodwill razor, and the inference of its being made for use on Gillette razors leaves no doubt in our mind that the officers of defendant, who were former Gillette officers and were familiar with it, manufacture it for such use and that they are contributory infringers. In view of the above, the record is remanded with instructions to enter a decree of validity of the claims and for an injunction and accounting.

Lest it should appear we have overlooked it, we mention the Canadian decision, which we have duly considered before arriving at our conclusion.