The BISHOP & BABCOCK MANUFAC-
TURING CO., Plaintiff,

v.

FEDDERS-QUIGAN CORPORATION,
Defendant.

Civ. A. No. 5532.

United States District Court
W. D. New York.

Nov. 1, 1957.

As Amended Dec. 19, 1957.

Brown, Jackson, Boettcher & Dienner, Chicago, Ill., Bean, Brooks, Buckley & Bean, Buffalo, N. Y. (Arthur H. Boettcher and Henry H. Babcock, Chicago, Ill., Conrad Christel, Buffalo, N. Y., of counsel), for plaintiff.

Albert R. Henry, Hyman Karnofsky, Buffalo, N. Y., Arthur Sheinberg, New York City, and Edwin J. Balluff, Detroit, Mich., for defendant.

MORGAN, District Judge.

### Statement of the Case

The Bishop and Babcock Manufacturing Company brought this action against Fedders-Quigan Corporation for alleged infringement of the Getz patent No. 2,594,008, which issued to plaintiff as assignee on April 22, 1952, for improvements in "Cellular Core for Heat Exchange Units". The identity of the parties, plaintiff's ownership of the patent, the acts of the defendant in making and selling heat exchange cores, including accused and non-accused models, jurisdiction of the Court, and like formal matters, were admitted and stipulated.

By Answer and Declaratory Judgment Counterclaim (I), defendant denied infringement and the validity of the patent. A second Counterclaim, charging infringement by plaintiff of one of defendant's patents, was withdrawn by Stipulation (Pars. 7 and 8) filed July 31, 1956. The case is thus reduced to the usual one, in which the questions for determination are the proper construction of the instrument sued upon, whether the patent is valid, and whether the claims can be deemed infringed by those models of defendant's cores which are specified in plaintiff's answer to defendant's Interrogatory No. 1, served February 18, 1953. (Exhibits P-3, Samples 1, 3, 5)

While all of the claims of the patent in suit are in issue, claims 1 and 6, which read as follows, may be taken as typical:

*Claim 1*

"In a cellular core for heat exchange units,

"(a) a plurality of sections each comprising two spaced apart substantially parallel and adjacent sheet metal water walls and a sheet metal spacer therebetween parallel therewith,

"(b) said water walls having spaced transverse ribs of substantially uniform width projecting therefrom *inwardly of said section,*

"(c) the water walls of adjacent sections having their front and back marginal portions secured together and being spaced part therebetween providing water passages between the water walls of adjacent sections,

"(d) said spacer having undulatory corrugations extending front to back thereof providing undulatory ribs *of curvilinear formation throughout their length with the undulations thereof merging smoothly into each other,*

"(e) *said spacer ribs* spanning the space between said two adjacent water walls and respectively seating on said transverse ribs thereof,

"(f) said spacer ribs having outwardly projecting positioning elements *at the outer sides of the undulations thereof* straddling the respective water wall ribs restraining said spacer ribs against displacement therefrom,

"(g) said spacer ribs defining in cooperation with said water walls continuous undulatory air passages extending from front to back of said section."

*Claim 6*

"In a cellular core for heat exchange units,

"(a) a plurality of sections each comprising two spaced apart substantially parallel and adjacent sheet metal water walls and a sheet metal spacer therebetween substantially parallel therewith,

"(b) said water walls having spaced transverse ribs each provided with a flat surface of appreciable width,

"(c) the water walls of adjacent sections having their front and back marginal portions secured together and being spaced apart therebetween providing water passages between the water walls of adjacent sections,

"(d) said spacer having undulatory corrugations extending from front to back thereof providing undulatory ribs *of curvilinear formation* throughout their length with the undulations thereof seating for substantially their full length upon said flat surfaces of said water wall ribs in metal to metal contact therewith and spanning the space between said two adjacent water walls and defining in cooperation therewith undulatory air passages extending from front to back of said section,

"(e) said spacer ribs having *interengaging relation* with said water wall ribs effective for restraining said spacer ribs against displacement from said water wall ribs."

The History of the Patent in Suit [1]

The file wrapper and contents (Exhibit P-2) sheds light on the proper construction of the claims. The application, as filed, contained 10 claims (Ex. P-2, pp. 12–19), all of which were rejected on the Examiner's first action (Ex. P-2, pp. 26, 27). The applicant amended, cancelling a substantial number of the claims, amending Claims 1 and 4, and adding three more claims. Of the cancelled claims, Nos. 7, 8, 9, and 10 had been limited to a core having a double

[1]. "A file wrapper makes dreary reading; yet it is the foundation of the patent and must in this instance be looked into carefully." Wolley, C. J., in Kausal v. American Seating Co., 3 Cir., 56 F.2d 557, 558.

spacer (Lear, p. 342), and as the double spacer is not expressly recited in any of the claims allowed, the claims of the patent are broad enough to include a core having a single spacer. This construction is consistent with the express language of the claims, which, as in Claim 1 quoted above, clause (e), provides that the ribs (39) of the spacer seat upon the ribs (34) of the water walls; and in Claim 6, clause (d), there is similar language to the effect that the spacer ribs seat for substantially their full length on the water wall ribs. The "undulatory air passages" of the claims are therefore the cells formed by the successive folds of the spacer and the water walls.

Reverting again to Claim 1 of the patent, clauses (d), (e) and (f), we find from the file wrapper, beginning page 28 thereof, that these clauses were amended and restricted to the underlined terminology. Thus, Claim 4 of the application, which, as so amended, became Claim 1 of the patent, originally called for the spacer ribs (39) to be "sinuous", for which the word "undulatory" was substituted, but it did not call for such undulatory ribs to be "of curvilinear formation throughout their length with the undulations merging smoothly into each other".

Thus the claim is not for a core having a spacer whose ribs are merely "undulatory" in any fashion, but for a core in which such ribs must be of the stated "curvilinear formation".

Turning to the specification, we find no use of the words "curvilinear formation", although the word "sinuous" is repeatedly used to describe the ribs 39, and the drawings show such ribs as being completely and truly curved. According to Webster's 20th Century Dictionary, "curvilinear" means "consisting of curved lines"; and a "curve", in geometry, is "a line which changes its direction at every point; a line in which no three consecutive points are in the same direction or straight line." Whether, as it now appears, the same result in practical use can be obtained with ribs

that are not so "curvilinear" cannot, according to the Ace Patent case (Exhibit Supply Co. v. Ace Patents Corporation), 315 U.S. 126, 62 S.Ct. 513, 86 L.Ed. 736, be considered in construing the claim as it stands.

Looking further to the amendments to application Claim 4, now patent Claim 1, we find that clause (f) was amended to state that the "outwardly projecting positioning elements" (40) are to be "at the outer sides of the undulations thereof", which is in accordance with the description and drawings. This is specific and exact language, and this amendment can only mean just what it says.

In Claim 6 (clause (d)) the spacer ribs are stated to be of "curvilinear formation", which is the terminology of Claim 1, and hence the same meaning applies. In the terminal clause (e), it is stated that "said spacer ribs (39) have *interengaging relation* with said water wall ribs", and the question is as to the meaning of "interengaging". The word is not in the application as filed, although "engaging" is employed in the patent, Column 4, line 20, to describe how the projections 40 lap over the ribs 34. But, as the specific type of location element is stated in Claims 1 through 4, then Claims 5 and 6 are entitled to some broader scope, depending upon what is meant by the somewhat tautological word "interengaging". If we give the word a very broad meaning, it simply means that there is something to act as a locating means. And in this connection, it may be noted that Claims 5 and 6 had predecessors in application Claims 14 and 15 (file wrapper, pp. 41, 42), which the examiner declined to enter because he thought them incomplete (file wrapper, p. 47). And in these predecessor claims, the terminal clauses called for "interengaging relation effective for restraining said ribs against movement *transversely*". The word "transversely" was dropped when the claims were rewritten, so, if the broad meaning be adopted, then the restraint may be in any direction,—for example, from face to face, as well as lengthwise of the core.

But there is another meaning for "interengaging" consistent with the specification. In Vrooman v. Penhollow, 6 Cir., 179 F. 296, 301, the Court was called upon to resolve a dispute as to the meaning of "engage" or "engaging", as contained in a patent claim for a vegetable topping machine. The Court drew a distinction between mere contact, and engagement, in this language:

"These conditions establish the necessity upon the defendants of showing that the complainants' patent of 1897 does not cover a form of construction in which the onions come in contact with the rollers. And to aid in that contention they urge that the word 'engage', in the next to the last line of claim 5 of the patent, includes also the idea of 'coming in contact'. But this conclusion is refuted by several reasons. The words themselves are not synonymous. *There may be contact without engagement which means in its mechanical sense a seizure, a laying hold of, an active prehension, and does not include mere contiguity.*" (Italics supplied.)

And compare the Ace Patents case, wherein the controlling change had been from "carried by the table" to "embedded in the table" [315 U.S. 126, 62 S.Ct. 517].

There is another point wherein the history of the patent is enlightening, and this has to do essentially with plaintiff's effort at trial to focus attention on "Col. 4, line 58", presumably to read into the claims something about "overlap" or "tangency", or to impress some unusual meaning on the words "undulatory air passages".

In responding to the first rejection of the claims, the applicant retained Claim 1 of the application as filed, which was then amended to read as follows:

"In a cellular core for heat exchange units,

"(a) a plurality of sections each comprising, two spaced apart sub-stantially parallel and adjacent sheet metal water walls,

"(b) and a sheet metal spacer between said water walls parallel therewith,

"(c) the water walls of adjacent sections having their front and back marginal portions secured together and being spaced apart therebetween providing water passages between the water walls of adjacent sections,

"(d) said spacer having *undulatory* corrugations extending from front to back thereof providing *undulatory* ribs of *curvilinear formation throughout their length with the undulations thereof merging smoothly into each other,*

"(e) *said ribs* spanning the space between and seating on said two adjacent water walls and in cooperation therewith defining continuous *undulatory* air passages extending from front to back of said section."

Now it will be noted that the "undulatory ribs" and the "undulatory air passages" are stated in this claim the same as they are in the allowed claims of the patent, and that Claim 1, as amended, was finally rejected, and cancelled (file wrapper, pp. 40, 41). The Examiner took the position that there was nothing in amended Claim 1 which was not shown in the Booth patent, and in cancelling the claim, the solicitor stated (file wrapper, pp. 44 and 51), that "in Booth * * the spacer has horizontal undulations, as noted by the Examiner." (Mr. Lear demonstrated that the Booth patent shows curvilinear ribs sufficiently close to satisfy the "tangency" concept. Record, pp. 254, 255, 369–371.)

Here we have a clear cut admission, by the cancellation and abandonment of the claim, that there is no novelty in "undulatory ribs" or the resulting "undulatory air passages", insofar as the claims of the patent in suit are concerned. We can search the file wrapper in vain to find any place wherein any stress was laid on the "overlap" or "tangency" idea,

as being an essential part of the asserted invention.

We are fortified in this conclusion by the extrinsic evidence adduced at trial. It was established that, with a high amplitude for the corrugations of the spacer ribs, there was a higher pressure drop than when the amplitude is less, as for example, by comparison of the McCord J core and the Fedders KU4–720, with the Fedders KU4–780 (defendant's Exhibits D-28 A and B, charts of test results). It was also established that too high a pressure drop cannot, under prevailing automotive practice, be tolerated for a main radiator (Baldwin and Finch, page 23).

But the patent in suit begins by stating:

"This invention relates to cores for heat exchange units such as *automobile radiators* and heaters * * *."

Again, page 2, col. 3, line 22:

"In Figure 1 I have shown a cellular core 20 embodying my invention, which is intended for use in an automobile heater, though *similar cores are suitable for use in radiators*."

And, in conclusion, col. 6, line 34:

"It will be understood that variations in detail may be resorted to without departing from the *field and scope* of my invention * * *."

There is a clear cut estoppel against the plaintiff's attempt to read something from the description into the claims. The field of the putative invention includes automobile radiators, and therefore the claimed core may have relatively low resistance to air flow, and passageways proportioned accordingly.

To sum up the patent and its history:

1. The claims of the patent are for a cellular core structure fabricated according to conventional and old practice.

2. The spacer is formed to have "undulatory ribs of curvilinear formation", which ribs abut against the water passages.

3. These ribs, together with the water walls, provide "undulatory air passages" through the core.

4. There is admittedly no novelty in such ribs or air passages, irrespective of what efforts may now be made to impress some unusual meaning on these recitals.

5. There is nothing in the patent, or its history, which defines "turbulence", or "high turbulence", or "tortuous", as having any unusual meaning.

6. Claims 1 to 4 seek to escape the patentee's disclaimer of application claim 1 by adding a location element, consisting of small projections at the outer sides of the undulations of the ribs, which straddle the water wall ribs.

7. Claims 5 and 6 are of somewhat broader scope in this last feature, calling simply for "interengaging relation" between the spacer ribs and water wall ribs.

8. The patent assigns no virtue to the positioning or locating element, except as an expedient useful in assembly.

#### The Getz Patent is Invalid

Thus the claims of the patent in suit are directed to a cellular core having the usual elements of water lines and spacers, with emphasis on the contouring of the spacer fins and the inclusion of locating means between the two basic elements.

Claim 6 (and Claim 5) is void for lack of novelty over the Kramer patent, mentioned in the prior art. The only words of even literal distinction which can be found is that the Getz ribs are "of curvilinear formation", and if this is considered any distinction, then "curvilinear" must be very strictly construed. There is not, however, on the Record in this case, any evidence that a "curvilinear" rib produces any different result than a "zig-zag" rib. There is evidence that such a variant in mere form does not produce a different result. Thus, in the McCord depositions, Mr. Cooper, McCord's experienced engineering vice-president, noted that the tool makers for the J core would experiment according to their own ideas, making variations in

the shapes of the waves (McCord deposition, pp. 109–110, Q. 321).

Again, as part of its prima facie case, plaintiff offered testimony to show that the accused KU–4–780 core had the same transfer characteristics as one of plaintiff's commercial cores (Baldwin, pp. 112–113, 142, 146). Plaintiff's core has a "curvilinear rib",—defendant's core has ribs composed of a series of straight lines (Finch, pp. 193–197, 221–224).

And, of course, as the file wrapper shows, "undulatory ribs of curvilinear formation" were found by the Examiner to be in the Booth patent, when he finally rejected Claim 1 of the application.

Certainly, no invention, or advance of the art, can be found from the mere substitution, by the Kramers, of Booth's particular form of fin.

Claims 1 through 4 are also void for lack of inventive novelty over the Kramer patents. It is assumed that Claim 1 need not be stated in full length again. The first limitation found in it, which is not in Claim 6, occurs at line 48 of Column 6, where it is specified that the wide ribs 34 of the water walls "project inwardly of the section". This is readily found in Kramer, whose wide ribs 10 of the water walls project toward the air space, relative to the zig-zag or sinuous portions of the water walls which are therebetween.

Next, Claim 1 differs from Claim 6 in its more detailed recital of the positioning means, beginning at line 61 of Column 6, where it is stated:

"Said spacer ribs having outwardly projecting positioning elements at the outer sides of the undulations thereof straddling the respective water wall ribs"

Specifically, this type of positioning element is not illustrated in Kramer No. 1,939,175, but is precisely shown in Kramer No. 1,606,643, where the bumps or lugs 8, 9, Fig. 10, are stated to "straddle the crowns of the adjacent corrugations and quite firmly lock the parts against relative movement" (page 2, line 42).

The Kramers contributed to the art the zig-zag rib formation with locking and locating elements at the apices of the ribs, they contributed full line contact between the spacer ribs and the water line ribs. No act of invention, as a matter of law, could be spelled out of utilizing the precise spacer of the first patent in lieu of that of the second. We say "as a matter of law" because it was held unequivocally in Smith v. Nichols, 1874, 21 Wall. 112, 119, 88 U.S. 112, 22 L.Ed. 566 that the mere substitution of equivalents is not patentable, and there has been no retreat from that proposition.

The Court said:

"But a mere carrying forward or new or more extended application of the original thought, a change only in form, proportions, or degree, the substitution of equivalents, doing substantially the same thing in the same way by substantially the same means with better results, is not such invention as will sustain a patent. These rules apply alike whether what preceded was covered by a patent or rested only in public knowledge and use. In neither case can there be an invasion of such domain and an appropriation of anything found there. In one case everything belongs to the prior patentee, in the other, to the public at large."

See also: Dunbar v. Myers, 94 U.S. 187, 199, 24 L.Ed. 34, collecting prior cases.

The McCord Prior Use—the "J" Core

The plaintiff conceded the sufficiency of the proof of prior use of the McCord J core, and hence it is believed that a brief review will suffice.

The McCord Corporation, of Detroit, Michigan, an old established manufacturer of radiators, made and sold, beginning in 1936, a radiator incorporating what it designated at its "J" core. Customers included Hudson, Packard, and Studebaker in the United States, and Chrysler for Canada, in which country McCord also has a manufacturing plant. Late in 1939, McCord devised a new core, termed the "K", which it deemed

to be better for original equipment sales, being lighter in weight and less expensive to manufacture (Cooper deposition, pp. 268–269). The "J" was therefore superseded and thereafter used for replacement sales, or for use in car heaters. Such sales continued, and were still being made in limited quantities when the deposition testimony was taken in 1953.

A number of specimens of the J core are in evidence, and include Exhibits D-8-1 and 2, 1936 Hudson radiator from which a portion has been cut away; D-8-4, small fragment used by Mr. Cooper to describe the construction; D-8-5A and D-8-5B, pieces of water line and spacer; D-8-7, Packard replacement core; D-8-41 and D-8-42, section and fragment produced by Mr. Scoville from the Chrysler Corporation laboratory; D-8-54 and D-8-55, specimens of spacer showing variations in the profile (serpentine and serpentine bump, Walerych deposition, page 243 et seq.); D-8-58 and D-8-59, partially rolled spacer strips; and D-8-62 and D-8-63, spacer and water line ribbon from the London, Ohio plant. Other specimens used for tests and demonstrations include Exhibits P-11, P-33, D-10.

The J core was fabricated in accordance with conventional practice,—that is, rolling the strips, making the sub-assemblies, and integrating with solder by face dipping, as was testified to by a number of the deposition witnesses, and as is apparent from inspection of the various samples. The water lines for the J core are rolled strips of brass, characterized by spaced narrow transverse corrugations or ridges projecting from the water space toward the air space, which delimit wider plane areas (Cf. also, Exhibit D-27-F, schematic line drawing; and Lear, pp. 356, 398).

The spacer ribbon is accordion pleated, with the lines of fold or ribs, which contact the water ribbon, being "herringbone", "wavy", "zig-zag", or "serpentine", to use the appellations of the deposition witnesses. This wavy contact line becomes very prominent when viewing a piece of core from which the fin has been pulled away. The air cell, which of course is the passageway formed by two successive folds of the fin and the adjacent water wall, accordingly has a form imparted by the wavy ribs of the spacer. These air passages, as is readily apparent, are V-shaped in cross section.

The small ridges on the water lines provide abutments for the apices of the successive waves of the spacer, and in that manner, provide a location element, or a positioning means.

In order to show further the nature of the air passages in the J core (as well as other cores), specimens in evidence were coated with plaster of paris which was smoothed off with a putty knife, thereby bringing into sharp focus the actual rib or line of contact (Exhibits to be found in stationery box, including D-8-5, D-8-54, D-8-55; Lear, pp. 350–351). Such ribs are definitely wavy, or whatever synonym one wishes to apply.

The bits of plaster, when removed from the ribbons (Exhibit D-26, cigar box), are casts of the actual air passages, and it is again readily apparent that they are "tortuous" or "undulatory", as the air streams are repeatedly deflected in direction (Lear, pp. 352–355).

Claim 6 of the Getz patent is fully anticipated by this prior use.

The only distinction one may draw between the J core and plaintiff's commercial cores said to be made under the patent is that the plaintiff's cores have a greater *degree* of waviness in the spacer ribs. But, that distinction is not expressed in the claim, nor should it be read thereinto, nor would it define patentable invention in any event.

Claim 5 falls with Claim 6. The only additional limitation in Claim 5 is that the spacer ribs have "flat crests of appreciable width" (Col. 8, line 26). No weight can be given to this limitation, as no one can tell from the patent when the crest has appreciable width.

Claims 1 through 4 are not literally applicable to the J core, but the limita-

tions which differentiate literally do not differentiate patentably. Thus, in these claims, the wide ribs of the water line project therefrom "inwardly of the section", which is the converse of the J structure. Again, the J spacer does not have "outwardly projecting positioning elements" on the ribs in contact with the water walls. These differences simply represent variants, to be found in the prior art, and which are not inventive.

The matter of a "positioning element" was passed upon by the Supreme Court in Essex Razor Blade Corporation v. Gillette Safety Razor Co., 299 U.S. 94, 57 S.Ct. 68, 81 L.Ed. 60. The original Gillette razor had a perforated blade, a guard, cap, and handle, and "positioning and clamping means passing through the perforations in the blade", for the purpose of centering the blade with respect to the other elements of the razor. Prior to the patent in suit in the Essex case, a number of patents had appeared, disclosing variants in the means for locating the blade in the razor. For the patent there in suit, it was contended that the positioning arrangement therein disclosed enabled the blade to be centered with greater accuracy (the Appellate Court, 3 Cir., 83 F.2d 541, found this feature to impart a true safety function, as cuts were greatly minimized). But the Court held in concluding its opinion:

"As already suggested, every safety razor consisting of a combination of guard, cap, blade, and clamping means must also provide means to keep the blade in position relative to the cap and guard. The means adopted have been various. Gillette resorted to the device of square rods or round pins fixed either to the guard or to the cap and slots or holes in the blade and the other member through which the rods or pins should pass to fix the blade in position. Gaisman fixed the blade relative to the guard by one set of lugs and slots and fixed it in relation to the cap by another set of lugs and slots. The choice was one between alternative means ob-

vious to any mechanic; it did not have the quality of invention."

So here, Getz, not only charged with knowledge of all the prior art, but having actually worked with cores having bumps on the spacer to engage ridges on the water line, or ridges or dimples on the water line to locate straight ribs on the spacer (Exhibits D-1 through D-5), simply used a means alternative to that found in the J core.

The McCord J core, and defendant's accused cores, are one and the same thing, as far as the Getz patent is concerned.

### The Efficiency of the McCord J Core

As noted above, Mr. Cooper stated that the J core was superseded by the McCord K, which is a single spacer type, because the K core showed savings in weight and labor costs. The J core had its own feature, which was an extremely high capacity per square foot of frontal area, and it is still an efficient core if you consider it from that point, as to its ability to dissipate heat from a limited area (Deposition, page 268, XQ 425). And Mr. Cooper spoke of "efficiency" with full understanding of the effect of resistance to air flow, and the effect of resistance in producing turbulence (Deposition, pp. 300–303).

Dr. Baldwin contributed his test finding that defendant's KU-4-780 had the same heat transfer characteristics and pressure drops as one of plaintiff's "BE" cores (Record, pp. 112–113; 142, 145–146, Exhibit P-26 curve sheet). From the axiom that things equal to the same thing are equal to each other, it follows that plaintiff's "BE" core is no more efficient than the McCord J core, taking into account the size or weight of the core in connection with the work input to the core (Kolb, p. 432).

Dr. Baldwin further stated (p. 483) that with respect to Curve 2, "all four heater cores would deliver the same heat per unit of time per unit of face area, which by this figure certainly is incontestable." Again, he testified (pp. 492, 493) that a condition can be stated under

which a high resistance core would be no better than a lower resistance core, due to the diminution in the air volume. (This may be illustrated further by any of the curves showing heat rejection against air flow, such as plaintiff's Exhibit P-35. At 3 CFM, the plaintiff's tests indicate approximately 3.5 BTU's for the J core, and 4 BTU's for the AE, with corresponding pressure drops of 0.11 and 0.19. But the J core will reject 4 BTU's per minute at an air flow of 3.8 CFM, at which air flow the pressure drop is 0.16, or still less than that of the AE as reflected in this particular curve sheet.)

Also, based on the 1950 tests offered through Mr. Mayo (over objection), it appears that one AE core which "as far as I know it is representative of the AE cores" (p. 328, line 19), was substantially identical to both the J cores tested by plaintiff and defendant, with respect to heat transfer, but the AE core had a higher pressure drop. This test would therefore show that this AE core was somewhat inferior to the J core (Kolb, pp. 431–433; Baldwin, pp. 493–494).

Another graphic method of analyzing the test results is to plot a "factor of merit" curve, which is Curve No. 4 in Exhibit D-29, and is based on defendant's test data. This plot compares the mechanical efficiency,—the air horsepower input factor divided into the heat rejection factor,—for various air flows. Herein we find that the line for the J core is considerably above that of the defendant's accused core (No. 3082) for any given air flow, and therefore may be accorded a higher rating. Again, accepting Dr. Baldwin's finding of the performance similarities of plaintiff's BE core and defendant's accused core (No. 3082 on Curve 4), the plaintiff's commercial core is less efficient than the McCord J core (Kolb, pp. 429–430).

The factor or figure of merit method of evaluating cores has been utilized by the Bureau of Standards and also by the British and French governments in studies of heat exchangers (Paper No. 211, p. 257), and is a recognized method,

as are the methods used in plotting Curves 2 and 3 (Ranov, pp. 449–452; 456–457).

Plaintiff's argument against the utility and efficiency of the J core, and defendant's methods of evaluation, seems to have these elements. First, it is said that the plaintiff's salesmen do not carry data as shown on Curves 2, 3 and 4 to show their prospective customers. Obviously, the Court is not particularly interested in selling tactics, as it is in scientifically acceptable facts which show that Getz has not contributed to the sum of human knowledge.

Next, an attempt is made to deprecate the power input to a heater fan motor, although at one time "they were very critical on power" (Mayo, p. 481, line 9), and the plaintiff's approach to the Chrysler Corporation to negotiate approval of its cores was through "Mr. Philip Kent, who was in charge of their electrical laboratory and heating development" (Mayo, p. 279, line 6). In other words, the electrical engineers of the customer determined how much power could be allocated, and therefore the resistance which could be tolerated.

Again, it was said that Curves 2 and 3 fail to show the face temperatures of the core, or of the air passing therethrough (Baldwin, p. 483), but the same comment can be made with respect to Curve 1, as the Court noted (pp. 489, 490). In this connection, it may be noted by inspection of both plaintiff's and defendant's test log sheets, that the air temperature rise, for all cores tested, increases as the air flow decreases. Once more, we are dealing with a variable which fluctuates with the operating conditions.

It was also stated that plaintiff's commercial cores can be built to have more heat rejection for a given air flow with some savings in weight. As a generality, that may be accepted, but again, the input power factor has to be considered, and such generality detracts nothing from the conclusions reached through Curves 3 and 4. As long as more resistance makes for a higher heat rejec-

tion at a given air flow, weight savings are to be expected for any such core, compared with a low resistance core.

Finally, Dr. Baldwin exhibited some smoke pictures (Exhibits P-36, P-37 and P-38, Record p. 490 et seq.) which purported to show more "diffusion" for the emergent smoke in the BE core than in the J. This is readily understandable, because the spacer to spacer contact in the BE has more "overlap" than in the J, and therefore more open spaces for the smoke, or air, to filter through. The same is true of the G & O core (Exhibit D-20), and it is the effect discussed in detail by Emmons and Schutt in their patents. Dr. Baldwin agreed that the flow could be "turbulent" in all cases.

Dr. Ranov also made some smoke pictures (Exhibit D-30) (Record, p. 442 et seq.) using models based on plaintiff's and defendant's cores, one set having an "overlap" and the other none. There is diffusion in each case, and there is no basic difference between them and the J core. "If there is a difference, it is a matter of degree" (p. 499, line 2; p. 454).

The plaintiff's attempt to show that there is some difference in kind between the Getz core and the McCord J core has failed. The failure could not be otherwise in the light of technical knowledge.

### Other Prior Art

■ The essential question, when prior art is shown, is whether or not the patent in suit rises to the dignity of invention, or whether it represents only the expected skill of the art. A succinct statement of the pros and cons of "combining references" is found in Lyman Gun Sight Corporation v. Redfield Gun Sight Corporation, 10 Cir., 87 F.2d 26, 27, from which the following is quoted, with omission of numerous Supreme Court and lower court cases:

"A union of selected old elements may constitute a patentable combination if by reciprocal or co-operative action on a common objective a new and useful result is effected or an old result is attained in a more facile, economical and efficient man-

ner. * * * But the mere use of antecedent elements to produce an old result is not invention. * * * Neither does the production of a new device by the rearrangement or manipulation of known elements through application of ordinary mechanical skill constitute invention although it may have required study, effort, and experimentation. * * *

"Where a patent includes a combination of elements, it is not necessary to establish anticipation that all of the elements be found in a single earlier patent or in a single device previously in general use. It is enough if the evidence, taken as a whole, discloses that all of the claimed elements are found in different prior patents, in the art or in different devices previously in general use, and no new functional relationship arises from their combination. * * * "

This statement of the law was approved in Allied Wheel Products, Inc., v. Rude, 6 Cir., 206 F.2d 752, 761, wherein the Court explained that the word "anticipation" is sometimes used, not as negativing literal novelty, but as equivalent of no invention.

In urging the Kramer patents and the McCord J core as invalidating the Getz patent, it is on the premise that in each instance the evidence supports a holding of lack of novelty, and that there is "anticipation" and "substantial lack of novelty".

If there is any distinction practical and real, or academic and illusory, between a "tortuous sinuous passageway", and a passageway having "tortuous or sinuous sides", we have been unable to appreciate it. And certainly we have not been able to find it in the claims of the Getz patent.

### The Getz Patent is Invalid Because It Is for an Unpatentable "Combination" of Old and Functionally Non-Cooperative Elements

All that the positioning elements 40 of the Getz patent are good for is to main-

tain alignment in the course of assembly, and that is a processing expedient, known and used for years.

This is a clear case of aggregation of old elements. Mr. Justice Jackson's incisive language in the A & P case (Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp.), 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162, is fully applicable here.

The A & P case restated what the Supreme Court had said many times before. In Pickering v. McCullough, 1881, 104 U.S. 310, 26 L.Ed. 749, the following appears in the headnote:

"2. A Combination of old elements is not patentable unless they all so enter into it as that each qualifies every other. It must either form a new machine of distinct character and function, or produce a result which is not the mere aggregate of separate contributions, but is due to the joint and co-operating action of all the elements."

This language has been criticized as being unnecessarily broad, particularly as applied to machines in which the several elements may act sequentially rather than simultaneously. But we know of no authoritative case in which such criticism has been leveled at a purely static article of manufacture.

The A & P case was accepted by the District and Appellate courts of the First Circuit as controlling authority in McCord Corporation v. Beacon Auto Radiator Co., Inc., 1 Cir., 193 F.2d 985.

In re Smith, 1947, 161 F.2d 274, 276, 34 C.C.P.A., Patents, 1007, was an appeal from the Patent Office to the Court of Customs and Patent Appeals from the final rejection of claims directed to an automotive radiator. The Board of Appeals had sustained the Examiner's rejection on a combination of references. In affirming, the Court said:

"Claim 13 is quite broad. It provides that the tube member is straight and recites that there is 'such space between adjacent members that air flowing through said spaces will be subjected to a venturi-

like effect and will be repeatedly agitated and mixed (that is, "turbulated") by said acutely inclined surfaces and the temperature of the air will be repeatedly equalized adjacent to said acutely defined surfaces.' * * *

"The main contention of appellant is that he has taken from the prior art certain features and applied them in a different relationship in a new structure and has brought about a new improvement of a patentable character. Appellant argues that not in fifty years of the automobile radiator industry has anyone made a similar combination and he particularly stresses the importance of the use of steel as provided for in claim 10, premising this argument upon the alleged prior understanding that by reason of the corrosive character of steel it was not thought feasible to use this metal in forming the tubes of a heat exchanger. Appellant argues that he has proceeded against the teachings of the art to produce an unexpected result and a substantially new improvement which should be regarded as rising to the dignity of invention. * * *

"Surely it cannot be argued that because appellant has picked out of the art certain well-known features with well-known functions and combined them into a new structure, with possible improved results, this necessarily connotes invention. Assuming that appellant has achieved improved results and that his structure has advantages over anything produced in the prior art, this does not necessarily signify that his production required the exercise of the inventive faculty. The old elements all perform the same functions in the new combination that they performed in the prior art; there is no new or unexpected coaction between them, and the results obtained can hardly be said to be those which are unobvious or unexpected.

"Of course, it is well-settled law that if one selects from the prior art well-known features in such a manner as to produce new, unobvious, unexpected and useful results which are not merely the accumulations of the good results taught by the art he has made an invention. Frequently combinations of old elements in new structures have resulted in inventions of a high order.

"However, it must be understood that the radiator art is a crowded one and that one who conceives of a new combination of old elements is rarely justified in claiming patentability merely because he has produced some improvement and no one else has made the same combination. * * *

*"It would be unfortunate, in cases like that at bar, to handicap the builders of heat exchangers by granting patents for mere combinations of old elements and thus restrain the freedom of those skilled in the art, unless such combinations produced a new, useful and unobvious result. The instant record affords no convincing showing that appellant's activities have gone beyond the realm which should be left open to those skilled in the art."* (Italics supplied.)

Daniel v. O. & M. Manufacturing Company, D.C.S.D.Tex., 105 F.Supp. 336, 340, no appeal, involved the validity of a machine patent for making the spacer fins of the Emmons patent No. 1,998,633, and which is the same as that shown in the Emmons patent in this Record. After stating his findings of fact, Judge Hannay announced in his conclusions of law:

"When the art to which a patent relates is highly developed and in a crowded field, and where the patent is a combination patent of the type represented by that here in litigation, there is necessarily a greater burden for establishing invention and validity of the patent

than in a new and unfamiliar field or with a basic discovery patent. (Citing McCord Corporation v. Beacon Auto Radiator Co., Inc., and A & P case.) * * *

"A patent for a combination which unites old elements with no change in their function than that theretofore performed is not a patentable invention." (Citations omitted.)

Plaintiff's Asserted "Commercial Success" is of No Significance

The plaintiff produced a summary of its sales records, for the purpose of showing "public acceptance", as counsel put it (p. 62), or "commercial success", to use the term so frequently found in the cases. In the instant situation, the principal customers for automotive cores are the automobile manufacturers, and any vendor, whether his product be a core, a battery, a radio, or any other part, must be prepared to supply that product in great volume. Core production is therefore measured in terms of hundreds of thousands a year, no matter who the supplier is. (Mayo, p. 72.) As Judge Hannay specifically found in the Daniel case:

"A radiator is essentially a heat exchange device and the growth of the radiator industry has followed closely the growth of the automobile industry."

The general rule concerning commercial success is that when the patented subject matter is found to be novel, and the question of the presence or absence of invention is in real doubt, then commercial success, which is evidence to some extent of utility, may or may not become a factor in tipping the balance in favor of sustaining the patent. But where there is no room for reasonable doubt, the assertion of commercial success is not to be used, first, to create a doubt, and second, to resolve it.

McClain v. Ortmayer, 141 U.S. 419, 427, 12 S.Ct. 76, 35 L.Ed. 800, is often cited. The Court stated, 141 U.S. at page 429, 12 S.Ct. at page 79:

"While this court has held in a number of cases, even so late as Magowan v. New York Belting & Packing Co., [141 U.S. 332, 12 S.Ct. 71, 35 L.Ed. 781] (decided at the present term,) that in a doubtful case the fact that a patented article had gone into general use is evidence of its utility, it is not conclusive even of that, much less of its patentable novelty."

And in the A & P case, supra, [340 U.S. 147, 71 S.Ct. 130] the Court flatly stated: "But commercial success without invention will not make patentability".

In Warner Brothers Company v. American Lady Corset Company, 2 Cir., 136 F.2d 93, 95, the Court remarked:

"In any event commercial success can only be a makeweight in support of a patent; it cannot take the place of invention."

Trimble v. Woodstock Mfg. Co., Inc., 297 F. 524, 528, affirmed per curiam, 297 F. 529, was decided by the first District Judge of this District, Honorable John R. Hazel. He observed:

"The commercial success of plaintiff's cribs in this case is not persuasive of invention. That rule applies in the main to cases wherein the court is in doubt as to whether the structure or device involved the exercise of the inventive faculty. Although the presumption of validity from the grant itself is ordinarily given weight, yet the facts here, in my estimation, outweigh this presumption."

Judge Mayer made an observation in Bonnie-B Co., Inc., v. Giguet, D.C., 269 F. 275, 277, affirmed per curiam, 2 Cir., 269 F. 1021:

"From any point of view, therefore, the conclusion is irresistible that the patent is void, both inherently for lack of invention, and because of the proved prior public use. Indeed, from my point of view, there is nothing in the case, except the argument which flows from

large commercial utility. Of course, it is fundamental that commercial utility is available only when a doubt as to patentability arises, but, in any event, as I have had occasion to point out heretofore, commercial success must be approached with caution when the subject-matter is an article of wear."

The following is cited from Minton Mfg. Co. v. Continental Briar Pipe Co., Inc., 2 Cir., 93 F.2d 271, 273:

"It is true that the patented cartridge has had great commercial success. Nearly 100 million have been sold, and without any extraordinary advertising. * * * In any event commercial success cannot serve as a substitute for invention; and if the successful device appears shortly after some obstacle to its creation has been removed, its success must be jealously scrutinized. (Citations.)"

In the case at bar, the defense has shown lack of substantial novelty in view of prior patents and prior uses; it has shown that the Getz patent presents no new principle; it has shown that even in plaintiff's commercial structures, the differences over older "radiators" is purely a matter of degree or a change of proportions. It has shown that Getz followed promptly after the removal of the "obstacle" of a limitation on power. Under these circumstances, sales of plaintiff's commercial cores in terms of hundreds of thousands a year—to an industry which purchases in terms of millions a year,—cannot imbue plaintiff's patent with the attributes of novelty and invention, or make of its claims patentable "new combinations".

The Court finds that defendant did not infringe the Getz patent. It also finds that the plaintiff's patent is not a basic or pioneer patent. Since we have the stipulation withdrawing defendant's second counterclaim, no disposition of same need be made.

Prepare order on notice.